IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 07-CR-30193-002-JPG-CJP |
| | ) | |
| TARA MORGAN, | ) | |
|     a/k/a "Tara Prince," | ) | |
|     a/k/a "Tara Jones," | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PRETRIAL HEARING AND DETERMINATION PURSUANT TO *DAUBERT v. MERRELL* AND FOR A PRETRIAL DETERMINATION OF ADMISSIBILITY PURSUANT TO FEDERAL RULE OF EVIDENCE 104**

Comes now the United States of America, by A. Courtney Cox, United States Attorney for the Southern District of Illinois, and through Steven D. Weinhoeft and Michael J. Quinley, Assistant U.S. Attorneys for said District, and for its response to Defendant's Motion for Pretrial Hearing and Determination Pursuant to *Daubert v. Merrell* and for a Pretrial Determination of Admissibility Pursuant to Federal Rule of Evidence 104 (Doc. 202, "Defendant's Motion") asks the Court to deny the Defendant's motion for pre-trial hearing. In support of said position, the Government states as follows:

**Statement of Relevant Facts Pertaining to Forged Documents:**

1.    Employee leasing companies are also known as "Professional Employer Organizations" ("PEOs"). PEOs are businesses that contractually assume responsibility for the human resource ("HR") related functions for small businesses, including: interviewing and hiring assistance, payroll management, employee benefit design and administration, and administration of federal and state workplace regulations. For purposes of payroll, benefits, and workers'

1

compensation, the employees of a PEO's client become employees of the PEO. The PEO leases the employee to its client in exchange for a fee. This arrangement allows the PEO to provide HR services to its client, which frees the client to dedicate its time to focusing on the substance of its underlying business.

2. An Administrative Services Organization ("ASO") is a business that also provides HR services to small businesses. ASOs have a fundamentally different structure than a PEO. Under both models, the employees perform work for the client business. However, under an ASO model, *the workers remain employees of the client business,* whereas under a PEO model the workers are employees of the PEO who are leased to the client business. Further, ASOs are not contractually obligated to provide workers' compensation insurance for the client's employees, while employee leasing companies are defined by their obligation to secure workers' compensation insurance for the employees the PEO leases to its clients.

3. As a PEO, LT Consulting Inc. carried an annual workers compensation pool policy that covered every employee of every client.

4. A billing factor that applied to LT Consulting Inc.'s workers compensation policy was the "experience modification" factor (a/k/a "the mod"). The "mod" is a function of the employer's past history of work-related injuries. The "mod" is a factor that is determined after comparing an employer's past claim history to the national claim history of other employers in the same job classification. If a company has a claims history that is average in its field, the experience modification will be one (1). If a company has a claims history that is less than the average, it will have a "mod" below one (1). If a company has a claims history that is above average, then the "mod" will be above one (1). As the claims activity increases, so does the modification factor (and by extension, the premium). The premiums for employers whose

employees have had a large number or more severe injuries in previous years would be higher than for employers with low injury or severity rates in the same industry, or for new companies with no history of claims. Experience modification is a multiplier applied to the payroll amount which is used to determine the final amount of premium. For example, a company with a "mod" of .5 would pay half as much premium as a company with a "mod" of one (1). A company with a "mod" of 2 would pay twice as much in insurance premium as a company with a "mod" of one (1).

     5.     Because the "mod" is a function of a claim history compared to job classification, the misclassification of employment can result in increases to the "mod." This is true, because loss experience that is typical for a "logger" would appear unusually high if those same losses were experienced by a worker who was misclassified as merely an "excavator" because the inherent risk that is anticipated is understated when the job is misclassified. Because the mod is also a function of claim history compared to payroll, the underreporting of payroll can operate to increase the "mod." This is true, because as the number of employees increase, so does the likelihood for work-related injury. If payroll is concealed from the insurer, normal losses will appear unusually high because those losses are distributed over an understated workforce.

     6.     Due in part to LT Consulting Inc.'s fraudulent activities, a 1.98 "mod," was promulgated and applied to their workers' compensation insurance policy on March 12, 2004. This resulted in LT Consulting Inc.'s workers compensation rates increasing 198% compared to when their policy was originally obtained. Because LT Consulting Inc. was a PEO, this "mod" applied to every employee of every client. Consequently, LT Consulting Inc. was effectively unable to continue in business with the 1.98 "mod" because their workers compensation costs essentially doubled. In addition, LT Consulting was unable to afford to pay the outstanding

premiums on their 2004 pool policy. Those outstanding premiums made it impossible for LT Consulting to obtain a new workers' compensation insurance policy going forward. As a result of these financial realities, it was impossible for LT Consulting to continue to provide PEO services to its clients.

7. Rather than cease operating LT Consulting or otherwise truthfully explain the situation to their clients, the coconspirators engaged in a course of conduct designed to continue their business relationship with their clients while secretly obtaining substitute insurance policies under false pretenses. Illinois is a "master policy" state, meaning that under Illinois law and NCCI regulations, businesses that are involved in a PEO relationship are required to be insured under the PEO's pool policy, and those businesses are not eligible to obtain individual workers' compensation insurance policies. Nonetheless, LT Consulting Inc. continued its business relationship with its clients with no actual substantive change in its operation. Simultaneously, Tara Prince, Laura Krpan, and Raymond "Bo" Linzee applied for individual workers' compensation policies in their client's names without the knowledge or consent of those clients. The applications were not signed by LT Consulting Inc.'s clients. Rather, the signatures of LT Consulting Inc.'s clients were forged on the applications.

8. By seeking the substitute, individual workers' compensation insurance policies for its clients under false pretenses, the coconspirators sought to fraudulently reduce the experience modification ("mod") attributed to individual clients of L.T. Consulting, and by extension, to fraudulently reduce the amounts of premium LT Consulting would have to pay to the insurance companies pursuant to their agreements with their clients.

9. The forged individual applications and related supporting documentation is part of the evidence that forms the subject matter of James L. Hayes' analysis.

10. In addition, an employee that LT Consulting leased to the 7th Street Café in Kentucky suffered an injury and filed a claim against a LT Consulting Inc.'s workers' compensation pool policy. The injured employee was ultimately denied coverage because the 7th Street Café was located in the State of Kentucky, which was outside of the scope of coverage for L.T. Consulting Inc.'s pool policy. The injured employee was provided a forged certificate of insurance in order to mislead that client into believing that LT Consulting Inc. had obtained insurance for 7th Street Café when the coconspirators knew that no such certificate of insurance had been issued. The forged certificate of insurance was created from a genuinely issued certificate of insurance also forms a subject matter of James L. Hayes' analysis.

## Issues Raised in the Defendant's Motion:

11. Originally, the Government hired a forensic document examiner named Bill Storer, whose forensic report was tendered to the defense during the regular course of discovery. Regrettably, Mr. Storer is recently deceased. Before he died, Mr. Storer made arrangements with James L. Hayes so that there would be a qualified document examiner who could see the case through to its conclusion.

12. Defendant's motion is predicated on a false assumption of fact. The Defendant seeks a *Daubert* hearing to exclude Forensic Document Examiner James Hayes from testifying on the assumption that he will be used as a vehicle to "get Mr. Storer's report into evidence." (Doc. 202 at 1). The Defendant's motion further asserts that Mr. Storer's original report is inadmissible hearsay. *Id.*

13. James L. Hayes conducted his own review of the questioned documents along with the known exemplars in order to conduct his own independent assessment of the evidence.

5

If called to testify at trial, Mr. Hayes will testify to his own conclusions. He will not be used merely as an instrument to introduce otherwise inadmissible evidence.

14. Further, Defendant's motion is based upon a sweeping conclusion that handwriting analysts are not experts, and that the discipline of forensic document examination is not reliable, as a matter of law. (Doc. 202 at 2, 5)

**Summary of the Government's Response:**

15. A hearing, *in limine*, is not appropriate at this time. First, the Defendant's motion is predicated on a false assumption of fact. If called to testify at trial, Mr. Hayes will testify to his own conclusions. He will not be used merely as a vehicle to introduce otherwise inadmissible evidence.

16. Second, the witness may not be called to testify at trial. If the defense challenges the veracity of the witnesses who assert that their signatures have been forged, then it may be necessary to call James Hayes to testify to further assist on that issue. However, if the defense concedes the obvious, and does not contest:

> a. that the 7th Street Café certificate of insurance was forged from the genuine certificate of insurance issued to Degabli Construction; and
>
> b. that signatures that appear on certain applications and client service agreements are not authentic signatures of the purported signers;

then it may not be necessary to call Mr. Hayes at all. Consequently, it would be a waste of judicial resources to engage in a hearing at this point.

17. Third, the Defendant's argument that forensic document examination is inadmissible as a matter of law is simply incorrect. In fact, an identical argument was dispatched in *United States v. Jones*, 107 F.3d 1147, 1159 (6th Cir. 1997) when the Court stated, "Appellant's first--and principal--argument is that expert handwriting analysis is not a field of

6

expertise under Rule 702. She is, therefore, asking us to do what no other court that we have found has done--hold that expert handwriting analysis is inadmissible under the Federal Rules of Evidence." The Defendant in this case similarly asks the Court to do what no Circuit Court has done, by ruling that handwriting analysts are not experts. (Doc. 202 at 2)

## Argument
## Forensic Document Examination is Admissible Pursuant to Fed. R. Evid. 702:

American jurisprudence on evidence rests upon a foundation of liberal admissibility and the conviction that the jury should be presented with any and all reliable evidence that will assist it in its deliberation. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 587 (1993) ("*Daubert*"). Rule 702 of the Federal Rules of Evidence ("Rule 702"), which governs the introduction of expert testimony, was drafted in accordance with the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Id.* (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).

In 1993, the Supreme Court decided *Daubert*, which addressed those instances where a party seeks to introduce expert testimony based upon a novel or unorthodox scientific theory or technique. Under the traditional test enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), a new discipline or technique had to reach general acceptance within the relevant scientific community before it could be admitted as expert scientific testimony. In *Daubert*, the Court held that the *Frye* test had been superseded by adoption of the Federal Rules of Evidence, and that the rigid, restrictive "general acceptance" standard was incompatible with the liberal precepts of Rule 702. *Daubert*, 509 U.S. at 585-88. It is noteworthy that the *Daubert* opinion was designed to relax the *Frye* standard in order to increase the type of admissible expert testimony, rather than restrict evidence from the trier of fact.

The *Daubert* Court cautioned, however, that Rule 702 does not extend carte blanche to litigants to present unorthodox or unproven theories to juries as established "science." As the Court noted, the text of Rule 702 itself calls upon the trial judge to act as gatekeeper and screen purported scientific evidence for reliability. *Daubert*, 509 U.S. at 589-90. Accordingly, the party offering purported scientific testimony must demonstrate that it represents "scientific knowledge" or the product of scientific reasoning or methods. *Daubert*, 509 U.S. at 592-93.

In undertaking the latter inquiry, the Court provided non-mandatory and nonexclusive factors for the trial court to consider: 1) whether the method consists of a testable hypothesis; 2) whether the method has been subject to peer review and publication; 3) the known or potential rate of error of the technique or theory when applied; 4) the existence and maintenance of standards and controls; and 5) whether the method is generally acceptable within the relevant scientific community. *Daubert*, 509 U.S. at 592-96. This list is neither definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony." *Id.* See also *Deputy v. Lehman Bros., Inc*., 345 F.3d 494, 505 (7th Cir. 2003), citing *Kumho Tire Co*. v. Carmichael, 526 U.S. at 137, 141 (U.S. 1999). *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004).

The Supreme Court in *Kumho Tire* explained that the *Daubert* factors have to be adjusted to fit the facts of the particular case at issue, with the goal of testing the reliability of the expert opinion. *Kuhmo Tire,* 526 U.S. 137, 150. The Court emphasized that *Daubert* must be interpreted with flexibility, to the extent that the Supreme Court stated that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* The Seventh Circuit has embraced this flexible approach. In acknowledging that the *Daubert* factors are guides to be

adjusted considering the facts of the case, the Seventh Circuit quoted from *Kuhmo Tire* distinguishing between engineering testimony resting on scientific foundations, compared to other cases where "the relevant reliability concerns may focus upon personal knowledge or experience" of the testifying witness. *United States v. Brumley,* 217 F.3d 905, 911 (7th Cir. 2000). The reason for this needed flexibility is that there are many different kinds of experts and many different kinds of expertise, including experts in drug terminology, *handwriting analysis*, land valuation, agricultural practices, railroad procedures, and so forth. *Id.* (emphasis added)

Applying the *Daubert* approach to handwriting, the district court must properly function as a gatekeeper at trial and determine whether testimony concerning the genuineness of a signature or a document is properly the subject of expert opinion. *Deputy v. Lehman Bros., Inc.* 345 F.3d 494, 509 (7th Cir. 2003) "The Seventh Circuit has yet to rule on that issue post-*Daubert,* however, every circuit that has considered the issue has allowed expert testimony on handwriting analysis." *Id.* See *United States v. Mooney*, 315 F.3d 54 (1st Cir. 2002); *United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995); *United States v. Mornan*, 413 F.3d 372 (3d Cir. 2005); *United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003); *United States v. Jones*, 107 F.3d 1147, 1159 (6th Cir. 1997); *United States v. Jolivet*, 224 F.3d 902 (8th Cir. 2000); *United States v. Prime*, 431 F.3d 1147, 1151-54 (9th Cir. 2005); *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999).

### Forensic Document Examination is Admissible Pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell*:

There is an accepted methodology within the field of forensic document examination. It is with an initial assumption of neutrality that differences in writings are examined to determine whether the differences are significant enough to indicate nonidentity or insignificant enough so

that they do not preclude identity. The methodology that evaluates and compares relevant versus irrelevant differences on the issue of common authorship is a legitimate exercise of an expert's skill in examining handwritings. It is simply the determination of the range of natural variation of a person's writings executed at different times - the intrawriter differences - as distinguished from the interwriter differences, that forms the basis for forensic handwriting analysis.

The methodical analysis of handwriting for distinctive characteristics grows out of a few simple principles: (1) not all people write in the same way and not all handwriting appears the same; (2) while a person's handwriting varies from time to time, the handwriting also carries some combination of recurring characteristics; and (3) the variance of characteristics within a particular person's handwriting is less than the variance of characteristics between the handwriting of all persons. If those foundations were not sound, a person would not be able to recognize even his own handwriting as different from any other writer. The examination of handwriting for distinguishing features is thus regarded as compatible to systematic inquiry and capable of providing insight on authorship.

In determining whether the same person authored the questioned document and the exemplars, a forensic document examiner makes a meticulous side-by-side, letter-by-letter comparison of the documents. The examiner uses such tools as microscopes and magnification loops to examine minute details. A single handwriting specimen may contain hundreds of details, and many of those details are inconspicuous to the untrained eye. These details are categorized as: (1) accidental features caused by the circumstances surrounding the execution of the particular document (such as the writing instrument or the paper), (2) class characteristics in the author's writing or printing style, or (3) individual characteristics of the author's style. Accidental features are not the basis of identification. Class characteristics help narrow the

group of possible authors of the questioned document, but the examiner cannot rely on class characteristics alone to identify a specific person as the author. To make an identification, the examiner must find individual characteristics. Those characteristics can take several forms: the manner in which the author begins or ends the word, the height of the letters, the slant of the letters, the shading of the letters, or the distance between the words. These matters are beyond the knowledge of the lay juror and are well established in the field of forensic science.

The examination of questioned handwriting as a discipline of forensic science has gained general acceptance as a legitimate technique in the forensic community. The examination of questioned handwriting is an expertise that has been provided by major federal, state, and local law enforcement agencies for almost 100 years. There can be no question that the discipline is generally accepted in the field of forensic science.

In addition to its general acceptance in the field of forensic sciences, the acquired skill of comparing handwriting samples has earned broad and lasting acceptance in American courts as a reliable forensic technique. An unbroken history of employing a qualified forensic document examiner to assist in identification of writers stretches from a time prior to the adoption of the Federal Rules, through the period before the *Daubert* decision, and thereafter under the *Daubert-Kumho Tire* formula. *United States v. Mooney*, 315 F.3d 54 (1st Cir. 2002); *United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995); *United States v. Mornan*, 413 F.3d 372 (3d Cir. 2005); *United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003); *United States v. Jones*, 107 F.3d 1147, 1159 (6th Cir. 1997); *United States v. Jolivet*, 224 F.3d 902 (8th Cir. 2000); *United States v. Prime*, 431 F.3d 1147, 1151-54 (9th Cir. 2005); *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999).

The established standing of handwriting analysis is reflected in the Federal Rules of Evidence itself. Rule 901(b)(3) specifically allows handwriting experts to authenticate

questioned documents by comparing them to previously authenticated specimens. Fed. R. Evid. 901(b)(3). *See United States v. McGlory*, 968 F.2d 309, 328-29 (3d Cir. 1992) (handwriting expert qualified to authenticate notes seized from defendant's trash). Similarly, the federal judicial procedure statute provides that known handwriting samples are admissible in evidence "for purposes of comparison, to determine the genuineness of other handwriting attributed to such person." 28 U.S.C. § 1731. *See United States v. Swan*, 396 F.2d 883, 885 (2d Cir. 1968) (testimony of handwriting expert admitted in conjunction with exemplars admitted pursuant to 28 U.S.C. § 1731).

This discipline of forensic document examination has been the subject of intense peer review, presentation and publication. The profession of questioned document examination possesses a voluminous technical and scientific literature. There exists, today, a vibrant exchange of information on the techniques of examining handwritings. These findings are published in peer-reviewed journals. There has never been an article published in that same peer-reviewed literature by a scientist or by a serious researcher who denies the existence of the principle of individuality of handwriting or the skill of a competent examiner to determine authorship of disputed documents.

Whether the theory or technique that the expert is offering has been subjected to peer review and publication is significant. According to the Supreme Court, "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability . . . But submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected" *Daubert*, 509 U.S. at 594. Additionally, the publication, presentation, and peer review of theories and techniques relied upon by a particular discipline go

a long way in securing general acceptance for that discipline in the relevant scientific community, another of the factors set forth by the court in *Daubert*. To indicate that there has been considerable peer review, Exhibit A (attached), offers a limited bibliography about handwriting and the basis for its examination and identification.

The only *Daubert* factor that is inapplicable to forensic document examination concerns the ability to discern a known error rate. Handwriting analysis and document examination is a unique event that cannot be statistically duplicated. Handwriting comparisons are not like DNA analyses where the four variables that form the basis for identification are clearly defined by the laws of physics and microbiology. In DNA analysis, the results of a particular examination cannot be quantified.

None of the forensic science disciplines that deal with comparisons based on unique occurrences, or clinical judgments, can establish the degree of confidence statistically with respect to an individual result. Fingerprint identification cannot state that a given identification has an specific probability of accuracy. Yet, fingerprint comparisons are routinely admitted as positive proof of identity. Firearms and toolmark determinations are competent evidence, yet those conclusions are not subject to statistical quantification when it comes to comparing striations on bullets that may change ever so slightly with each successive use of the weapon that was used. Certainly, opinions of pathologists offering time-of-death testimony or causal-connection opinions in a particular medical examination cannot be stated with a statistically validated degree of probability. Similarly, forensic psychiatrists faced with same clinical record often testify to differing conclusions about an individual's psychological condition based upon their individual interpretations of the evidence.

The *Daubert* decision, does not require proof of mathematical precision in expert opinions. Other than a mere mention of error rates, known or potential, in the *Daubert* opinion, there is no requirement in the law that opinion testimony of experts is admissible only if they are able to state their opinions with a quantifiable degree of certainty. That is why experts are permitted to express opinions to a reasonable degree of medical certainty, to a reasonable degree of scientific certainty, and to a reasonable degree of professional certainty.

It is with the recognition that many types of expert testimony are based almost entirely upon the professional judgment of the testifying witness that the Supreme Court explicitly noted, in some disciplines, the relevant reliability concerns may focus upon personal knowledge or experience" of the testifying witness. *Kuhmo Tire,* 526 U.S. 137, 150.

Examining the personal knowledge and experience of James L. Hayes, it is manifest that he is an eminently qualified expert. His curriculum vitae is attached, as Exhibit B.

Mr. Hayes has been a forensic document examiner for 35 years, both in private practice and as a member of law enforcement. A summary of his credentials demonstrate the type of witness who the Supreme Court must have envisioned when it stated that relevant reliability concerns can be satisfied by focusing "upon the personal knowledge or experience" of the testifying witness. *Kuhmo Tire,* 526 U.S. 137, 150.

He is a member of the American Board of Forensic Document Examiners, as a Diplomat and former director. He holds memberships in the following professional associations: American Society of Questioned Document Examiners, American Academy of Forensic Sciences, Canadian Society of Forensic Science, International Association of Master Penman, Engrossers and Teachers of Handwriting (Past President), and the International Association for Identification.

Mr. Hayes has attended and participated in more than 50 seminars and workshops by groups such as: American Society of Questioned Document Examiners, International Association of Master Penman, Engrossers and Teachers of Handwriting, Southwestern Association of Forensic Document Examiners, American Law Institute/American Bar Association, United States Postal Inspection Service, Printing Industries Institute, Federal Bureau of Investigation, Internal Revenue Service, Midwest Association of Forensic Sciences, and the Canadian Society of Forensic Sciences.

In addition, he has been recognized as an expert and provided opinion testimony in State, Federal, Civil and Criminal Courts and Labor Arbitration Boards in Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, North Dakota, Ohio, South Dakota and Wisconsin.

He has studied the recognized books and read the published articles by the recognized authors in the field of Document Examination. He maintains a library of over 2,000 books and articles regarding Document Examination. He is a subscriber to recognized scientific and professional journals that relate to Forensic Document Examination. He is also published in the field.

Not only are his credentials impressive, but in a civil context, the Seventh Circuit relied upon this very witness' testimony as an adequate basis to affirm granting summary judgment earlier this year. *United States Bank Nat'l Ass'n v. Cook*, 2009 U.S. Dist. LEXIS 318 (D. Ill. 2009).

There is simply no credible argument that handwriting analysis is inadmissible as a matter of law.

**Conclusion:**

The Defendant's motion for a pre-trial hearing should be denied. A hearing, *in limine*, is not appropriate at this time for three reasons. First, the Defendant's motion is predicated upon the false assumption that James L. Hayes would not be testifying to his own opinions. Second, the motion presents the likelihood of wasting judicial resources because the witness ultimately may not testify. It would similarly be a waste of Government resources to expend resources for the witness to travel and prepare for a hearing that may ultimately be unnecessary. Whether the witness testifies will be a strategic decision that is made after assessing the defense's approach with other witnesses and the strength of other witnesses' testimony. Finally, the Defendant's motion should be denied because it grossly misstates the law by asserting, as a matter of law, that testimony pertaining to handwriting analysis is categorically inadmissible. By contrast, under the facts of this case, James Hayes' testimony would be admissible under Fed. R. Evid. 702.

The Government agrees not to mention this witness in opening statements and agrees to advise the Court during the course of trial once a decision has been made as to whether the witness will testify so that any appropriate *Daubert* arguments can be made at a convenient time outside of the presence of the jury.

**WHEREFORE,** the Government prays this Honorable Court will enter an order denying the Defendant's motion for a pre-trial hearing.

Respectfully submitted,

A. COURTNEY COX
United States Attorney

*s/ Steven D. Weinhoeft*

                                        STEVEN D. WEINHOEFT  
                                        Assistant United States Attorney  
                                        Nine Executive Drive  
                                        Fairview Heights, IL  62208  
                                        Phone: (618) 628-3700  
                                        Fax:    (618) 628-3720  
                                        E-mail:Steven.Weinhoeft@usdoj.gov

Case 3:07-cr-30193-JPG-CJP   Document 211   Filed 09/25/09   Page 17 of 18   Page ID #835

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-CR-30193-002-JPG-CJP |
| ) | |
| TARA MORGAN, ) | |
|     a/k/a "Tara Prince," ) | |
|     a/k/a "Tara Jones," ) | |
| ) | |
|     Defendant. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on **September 25, 2009,** I caused to be electronically filed the **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PRETRIAL HEARING AND DETERMINATION PURSUANT TO *DAUBERT v. MERRELL* AND FOR A PRETRIAL DETERMINATION OF ADMISSIBILITY PURSUANT TO FEDERAL RULE OF EVIDENCE 104** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

    **Counsel for Tara Morgan (2)**
    John D. Stobbs, II
    Email: stobbsjohn@hotmail.com; and
    Grant J. Shostak
    Email: gshostak@shostaklawfirm.com,
            rmense@shostaklawfirm.com.

    Respectfully submitted,

    A. COURTNEY COX
    United States Attorney

    *s/ Steven D. Weinhoeft*

    STEVEN D. WEINHOEFT
    Assistant United States Attorney
    Nine Executive Drive
    Fairview Heights, Illinois  62208
    (618) 628-3700 telephone
    (618) 628-3720 facsimile
    E-mail:  Steven.Weinhoeft@usdoj.gov